# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-3892

———————

United States of America,      *

     *

        Appellant,     *

     *   Appeal from the United States

    v.        *   District Court for the

     *   District of Minnesota.

Antonino Cedillo Aguilar,     *

     *

        Appellee.     *

———————

Submitted: June 15, 2004
Filed: September 13, 2004

———————

Before MURPHY, HEANEY, and BRIGHT, Circuit Judges.

———————

BRIGHT, Circuit Judge.

The government appeals the district court's[1] grant of the suppression of Antonino Cedillo Aguilar's confession to drug activity, asserting that the district court erred in determining that the circumstances of Aguilar's questioning rendered his confession involuntary. Relying on the United States Supreme Court's recent opinion

———

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable Susan Richard Nelson, United States Magistrate Judge for the District of Minnesota.

in <u>Missouri v. Seibert</u>, 124 S. Ct. 2601 (2004), we affirm the district court's suppression of Aguilar's statements.

I.     BACKGROUND

Beginning in August 2002, Minneapolis police investigated a drug conspiracy, including sending in an undercover officer to participate in the conspiracy.  On September 16, 2002, Minneapolis police officer Luis Porras, acting undercover, went to the home of a cooperating witness to buy a kilogram of cocaine in a previously arranged drug sale.  Police videotaped the entire transaction.  Officer Porras brought a bright orange lunch box, concealing $20,000 in drug buy money.  Officer Porras gave the informant the lunch box containing the money.  The informant then provided Officer Porras with a brick of cocaine.  After the transaction, Aguilar arrived, entered the house, and departed with the orange lunch box.  Aguilar then drove to a restaurant, which police also had under surveillance, and brought the lunch box inside.  Police did not arrest Aguilar at this time.

Three months later on December 11, 2002, police arrested Aguilar.  A plain-clothed officer took Aguilar to a basement office in the Minneapolis Police Department's narcotics division.  Officers Porras, Bart Hauge, and Jose Francisco Gomez were present for most of Aguilar's interrogation.  Both Porras and Gomez spoke Spanish.  Officers asked Aguilar if he would prefer to proceed in Spanish or English, Aguilar responded that he would prefer to respond in Spanish.

Officers questioned Aguilar before providing him with a written copy of <u>Miranda</u>[2] warnings in Spanish.  In giving the warnings, officers instructed Aguilar to read the warnings aloud and acknowledge that he understood them.  Aguilar signed and dated the document in the presence of all three officers.  Police officers then

_____

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

-2-

questioned Aguilar in Spanish for approximately twenty minutes, detailing Aguilar's participation in the drug conspiracy. Police recorded the questioning that occurred after providing Aguilar the Miranda warnings.

During the recorded interview, officers asked Aguilar about the events of September 16, 2002, the videotaped drug sale, and about his drug-trafficking activities in general. Aguilar responded with an appropriate, detailed answer to each of the questions posed about criminal activity that occurred three months prior to the interview.

Aguilar moved to suppress the statements that he made both prior to and after police provided him with Miranda warnings. The magistrate judge heard testimony on March 3 and 4, 2003, and additional testimony on April 18, 2003. Considering and relying on the additional evidence from the April 18, 2003 hearing, the magistrate judge recommended the suppression of Aguilar's statements to the police. The district court adopted the magistrate judge's report and recommendation on November 19, 2003.

The magistrate judge found that police conducted a lengthy interview of Aguilar prior to his recorded statements, and prior to giving Aguilar any Miranda warnings. The judge accepted Officer Gomez's statement that Aguilar's interview lasted approximately two hours, yet the tape-recorded portion only lasted approximately twenty minutes. Thus, the judge concluded that police interrogated Aguilar for approximately an hour and a half prior to giving him Miranda warnings. Accepting Aguilar's version of the unrecorded questioning, the judge explained that, unlike other witnesses, Aguilar offered an explanation for what took place during the prerecorded statements.

In addition, the magistrate judge observed that Officer Hauge's version of events was not credible because he did not understand Spanish, and he omitted the

fact that other questioning took place before the recorded questioning. The judge also questioned the credibility of Officer Gomez. Officer Gomez said that prior to giving Aguilar Miranda warnings, they only gathered routine booking information. The court rejected this testimony as not credible because Officer Gomez failed to explain why it took officers over an hour and a half to gather routine biographical information from Aguilar. The judge doubted the officers' version of events, namely that during the unrecorded interview they only asked for biographical information, because it did not explain how Aguilar could recall precisely events that occurred three months prior to his arrest in the brief recorded interview.

The magistrate judge also found that during the unrecorded interview Officer Porras became angry, kicked his desk, and swore at Aguilar when Aguilar did not respond in a manner anticipated by Officer Porras. Officers also informed Aguilar that they would release him if he cooperated. Prior to giving Aguilar a copy of his Miranda rights and recording his confession, officers informed Aguilar that if he behaved incorrectly in the recorded interview none of the previous interrogation would do him any good.

The magistrate judge suppressed the confession based on the totality of the circumstances and that, under Streetman v. Lynaugh, 812 F.2d 950, 957 (5th Cir. 1987), the promise of immediate release made the resulting confession involuntary. As previously stated, the district court adopted the report and recommendation of the magistrate judge. The government timely appeals.

II.   ANALYSIS

When reviewing a suppression order, we review a district court's factual findings for clear error and review its conclusion as to whether the search violated the Fourth Amendment *de novo*. United States v. Hessman, 369 F.3d 1016, 1019 (8th Cir. 2004). This case turns on the voluntariness of Aguilar's confession. "A

-4-

statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001). Courts weigh the voluntariness of a confession based on the totality of the circumstances. United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). The government bears the burden of persuasion and must prove by a preponderance of the evidence the voluntariness of the challenged statements. Id.

Considering the facts and circumstances, the government asserts that Aguilar voluntarily confessed. Thus, the district court's contradictory determinations should be reversed. We note two recent decisions, one by the United States Supreme Court and the other by our court sitting *en banc*, which guide our review. Subsequent to submission of this appeal, the United States Supreme Court issued its decision in Missouri v. Seibert, 124 S. Ct. 2601 (June 28, 2004), which held that Miranda warnings given mid-interrogation, after the defendant gave an unwarned confession, were ineffective, and thus a confession repeated after warnings were given was inadmissible at trial. Further, after appealing the district court's suppression of Aguilar's statements and after parties completed briefing in this case, this court, *en banc*, decided United States v. LeBrun, 363 F.3d 715 (8th Cir. 2004), which addressed the voluntariness of a confession after officers used psychological pressure to facilitate the confession. We comment on each case.

A.     Missouri v. Seibert

The ruling in Seibert limits Oregon v. Elstad, 470 U.S. 298 (1985), on which the government relies here, to its facts. In Elstad, police went to a young suspect's house to take him into custody on a burglary charge. Before the arrest, one officer spoke with the suspect's mother while another officer conducted a brief stop of the suspect in the living room. Id. at 301, 315. The suspect acknowledged that he was present at the scene of the burglary. Id. Later, at the police station, after receiving

the Miranda warnings, the suspect made a full confession. The Court acknowledged that the first brief encounter did not have any "earmarks of coercion." Id.

In Seibert, the Court limited Elstad's holding to the facts of the case, defining a voluntary statement as one given absent the pressure of techniques and methods used by law enforcement that are offensive to due process. The Court in Seibert, however, addressed the police tactic of questioning a suspect, then providing Miranda warnings, and then re-questioning. According to the findings by the district court, the police used a similar tactic in this case.

The following are the circumstances in Seibert. Patrice Seibert had a young son with cerebral palsy. Seibert, 124 S. Ct. at 2605. The son died in his sleep, but Seibert feared that police would arrest her for neglect. She recruited her two teenage sons to conceal the death by burning the family's mobile home. The two boys left a mentally-ill teenager in the trailer. This person died in the fire. Id. at 2605-06. Later, police questioned Seibert about the fire. The questioning officer, upon instruction, refrained from giving Seibert the Miranda warnings. Id. at 2606. Police took Seibert to an interviewing room, where police left her alone for thirty to forty minutes. On questioning, Seibert admitted she knew the mentally ill boy would die in the fire. After a twenty-minute break in questioning, police provided Seibert with the Miranda warnings, obtained a written waiver of her Miranda rights, and had Seibert re-confess. At the subsequent suppression hearing, the officer "testified that he made a 'conscious decision' to withhold Miranda warnings, thus resorting to an interrogation technique that he had been taught: question first, then give the warnings, and then repeat the question." Id. at 2606.

The Court emphasized that not only did the officer admit to the interrogation tactic; such tactics are promoted by national police training organizations and police departments. Id. at 2608-09. However, the Court did not limit its holding to cases where such tactics are made explicit. In "question-first" cases, the courts must

determine whether the use of the tactic inhibits the effectiveness of the <u>Miranda</u> warnings and the concerns addressed in <u>Miranda</u>.  <u>Id.</u> at 2610.  In order to validate the use of the tactic, the defendants must believe they have a real choice regarding the decision to continue speaking to police.  <u>Id.</u>  Unless defendants have that choice, such formal warnings do not meet the requirements of the holding in <u>Miranda</u> and do not distinguish "the first, unwarned and inadmissible segment" from the statement that meets the formal requirements of <u>Miranda</u>.  <u>Id.</u>  The Court explained that the use of the coordinated and continuing questioning is "likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'"  <u>Id.</u> at 2611(quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 424 (1986)).

In determining whether <u>Miranda</u> warnings delivered midstream are effective, the Court delineated a list of factors for the court to consider.  <u>Id.</u> at 2612.  First, the court must address the extent of the first round of interrogation.  <u>Id.</u>  The court should also address the extent to which the first round and second round of interrogation overlap.  <u>Id.</u>  Additional factors include the timing and setting of both questioning sessions, including whether a continuity of police personnel existed.  <u>Id.</u>  Finally, the court should examine the extent to which "the interrogator's questions treated the second round as continuous with the first."  <u>Id.</u>

In applying these factors to Seibert's case, the Court explained that the police purposely questioned Seibert without giving her the <u>Miranda</u> warnings; the same officers conducted the two interrogation sessions in the same location and the sessions occurred close in time.  <u>Id.</u>  Further, the officer said nothing to counter the idea that the unwarned statements could be held against her.  <u>Id.</u>  In fact, the Court noted the police officers referred back to the unwarned testimony in the second

questioning.  Id. at 2613.  The Court concluded that, unlike the facts in Elstad,[3] the facts questioned whether the Miranda warnings officers provided to Seibert offered her the possibility to decline to continue speaking to police.  Id.

In its conclusion, the Court explained:

> Strategists dedicated to draining the substance out of Miranda cannot accomplish by training instructions what Dickerson [v. United States, 530 U.S. 428 (2000)] held Congress could not do by statute. Because the question-first tactic effectively threatens to thwart Miranda's purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, Seibert's postwarning statements are inadmissible.

Id.

The facts before us are closer to those in Seibert than those in Elstad.  While the court below did not have the benefit of the precedent in Seibert, we do, and will apply the factors in Seibert in explaining our decision and reviewing the district court's ruling.  To begin, it is not entirely clear the extent of Aguilar's first questioning session.  However, the court determined that the first questioning session consisted of more than routine booking questions, included some good cop/bad cop questioning tactics, and lasted approximately ninety minutes.  Further, the scope of the first interrogation provided enough background for Aguilar to clearly recall events that occurred three months earlier.  Aguilar's two interrogations were not separated in time, occurred in the same interrogation room, and the same officers participated in the questioning.  Cf., United States v. Libby, 2004 WL 1701042, *6 (D. Me. July 30, 2004) (distinguishing facts from Seibert where interrogations were separated by

_____

[3]The Court noted that Elstad is different because the location, time, and short nature of the unwarned questioning distinguish the two cases.

-8-

approximately twenty hours, change of location, and different questioning officers). Thus, in weighing the factors and reasoning in <u>Seibert</u>, we determine that providing Aguilar the <u>Miranda</u> warnings between the two questioning sessions did not serve the purpose of the dictates in <u>Miranda</u>, because it did not provide Aguilar with a meaningful opportunity to make an informed choice regarding his right to provide police with an admissible statement.

Moreover, the facts found by the magistrate judge and the magistrate judge's discussion indicate that the defendant's post-<u>Miranda</u> warning statement was the result of coercion and that the acts of the police were intentional. Additionally, no curative steps were taken to warn or notify defendant that his first statement would probably be admissible in court.

The magistrate judge's discussion and determination satisfy the concerns of Justice Kennedy who added the fifth vote of the Supreme Court in the judgment in <u>Seibert</u>. Justice Kennedy would apply a narrower test than the plurality in excluding the confession in a two-step interrogation as here and as in <u>Seibert</u>. His test requires that the confession will be excluded when the two-step interrogation is used in "a calculated way to undermine the <u>Miranda</u> warning." <u>Seibert</u>, 124 S. Ct. at 2616 (Kennedy, J., concurring in the judgment). That was the situation in <u>Seibert</u> and here, as the method and timing of the two interrogations establish intentional, calculated conduct by the police.[4]

---

[4]Justice Breyer agreed with the plurality opinion in full and emphasized that "[c]ourts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." <u>Seibert</u>, 124 S. Ct. at 2613 (Breyer, J., concurring). Justice Breyer also agreed with Justice Kennedy's opinion "insofar as it is consistent with this approach and makes clear that a good-faith exception applies." <u>Id.</u> at 2614. The record and magistrate judge's findings demonstrate an absence of good faith in the defendant's interrogation.

B.      United States v. LeBrun

As previously noted, after appealing the district court's suppression of Aguilar's statements and after the parties completed briefing in this case, this court, *en banc*, issued the opinion in United States v. LeBrun, 363 F.3d 715 (8th Cir. 2004). In LeBrun, this court reversed the district court's suppression of a confession where the police failed to advise the defendant of his Miranda rights, lied to him, played on his emotions, and said he would not be prosecuted if he admitted wrongdoing. Id. We determine that the facts of this case are factually distinguishable from those in LeBrun.[5]

In LeBrun, we determined that the facts and the circumstances of the case did not indicate that the police's tactics in questioning LeBrun affected his ability to appreciate his decision to continue answering questions. Police suspected that LeBrun, while enlisted in the United States Navy, had strangled his superior officer in 1968. LeBrun, 363 F.3d at 717. The victim's family continued in their efforts to bring LeBrun to justice. Thirty years later, Naval Criminal Investigative Service ("NCIS") conducted several interviews of LeBrun. Id. In 2000, LeBrun accompanied NCIS investigators for additional questioning, but was not arrested. Id. at 718. The agents used several psychological ploys during the interview to facilitate a confession, including playing on LeBrun's financial status and his family's reputation. Id. LeBrun confessed to the killing. Id. at 719. On a later date, police arrested LeBrun for the murder. LeBrun moved to suppress his confession. Id.

This court explained that several factors supported the voluntariness of LeBrun's confession. First, the court emphasized the circumstances of the confession, namely that LeBrun confessed after police questioned him for thirty-three minutes, and was not under arrest. Id. at 724. In addition, the unarmed agents never shouted

---

[5]LeBrun did not address the question-first tactic at issue in Seibert.

or physically threatened LeBrun. Id. LeBrun was not handcuffed. Id. at 722. The agents told LeBrun that he could leave at any time and permitted him to use his cell phone. Id.

We also determined that the psychological tactics (making false promises, playing on his emotions, and using his family against him) did not render LeBrun's confession involuntary. Id. at 724. We reversed the district court's determination that such psychological tactics in conjunction with promises of non-prosecution rendered LeBrun's confession involuntary. The agents had reassured LeBrun that they believed that he would not be prosecuted if he admitted the murder was spontaneous. Id. at 725. This court held that LeBrun's mistaken belief that he could not be prosecuted did not render his confession involuntary based on the totality of the circumstances of the case. Id. The court emphasized that the promise represented just one factor. Id. Weighing against this factor was the fact that LeBrun had some legal training (one year of law school) and that he had a subjective understanding of his Miranda rights. Id. at 726. In addition, the court emphasized that LeBrun had met with agents on four separate occasions prior to his confession. The court concluded that LeBrun made his statement voluntarily because "LeBrun is an intelligent, calculating person who erroneously perceived a potential loophole in the prosecution's case and tried to take advantage of it by confessing . . . it is clear to us that LeBrun's capacity for self-determination was not impaired." Id. at 727.

As the government asserts, the mere fact that police promised Aguilar that he could leave after he confessed is not sufficient to find that Aguilar confessed involuntarily. However, other factors and the totality of the circumstances indicate that Aguilar did not confess voluntarily. Aguilar's case presents facts directly opposite to that in LeBrun. Unlike LeBrun, Aguilar did not possess any experience with the United States criminal justice system. Aguilar had only met once with police, and about an incident that occurred three months earlier. Aguilar's questioning was not brief. Officers questioned Aguilar for more than two hours, with

-11-

more than ninety minutes of questioning before providing him with his <u>Miranda</u> warnings. Unlike LeBrun, Aguilar was not provided with any means to leave the police station. Aguilar had his leg cuffed to the leg of a chair for a portion of the interview.

The Court's holding in <u>Seibert</u> provides an additional factor to use in weighing in the determination of whether a defendant made a confession voluntarily, namely the courts should strictly scrutinize confessions where police have used the question-first tactic. The district court determined that Aguilar's confession was involuntary and should be suppressed. Based on the law of <u>Seibert</u> and cognizant of our holding in <u>LeBrun</u>, the district court did not err in that determination.

III.   CONCLUSION

Accordingly, we affirm.

_____