# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2377

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY STEWART,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. EV 01-32-CR-01-Y/H—**Richard L. Young**, *Judge.*

———————

ARGUED SEPTEMBER 15, 2004—DECIDED NOVEMBER 9, 2004

———————

Before EVANS, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Timothy Stewart was convicted by a jury of armed bank robbery and use of a firearm during a crime of violence. He confessed to these crimes, but argues that his confession should not have been admitted at trial because the police used a two-step interrogation process in which *Miranda* warnings were initially withheld, in violation of *Miranda* as applied in the Supreme Court's recent decision in *Missouri v. Seibert*, ___ U.S. ___, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). He also claims the confession was involuntary in light of a promise of leniency made by the interrogating officer, and that his trial counsel

was ineffective in not moving to suppress the confession as the fruit of an unlawful arrest. Finally, Stewart argues that his trial counsel was ineffective because she did not assert a *Brady* violation or seek a missing evidence instruction regarding the partial erasure of a surveillance videotape of the robbery.

We reject Stewart's various ineffective assistance of counsel claims and also affirm the district court's conclusion that Stewart's confession was not involuntary because of an improper police promise. On the present record, however, we cannot determine whether the admission of Stewart's confession requires reversal under *Seibert*. We therefore remand for further proceedings consistent with this opinion.

## I.  Background

Ten days before Halloween 2001, the Old National Bank in Evansville, Indiana was robbed by a man dressed in black and wearing a skeleton mask. The robber entered the bank at about 9:30 a.m. carrying an SKS rifle and a duffel bag. He ordered everyone to the ground, leaped over the teller counter, pointed the rifle at one of the tellers, and told her to fill the duffel bag with money. As she did so, another teller activated the bank's alarm. The robber escaped through the rear door of the bank, where he was seen by an emergency medical technician who had just parked her ambulance and was preparing to go into the bank. The technician saw the robber get into a white car and noticed a red mist billowing inside the car as it headed west away from the bank.

The robber did not stay in the car very long. Evansville Police Officer Michael Sitzman, responding to a dispatch about the robbery, was in his squad car about a block from the bank when he observed a black man carrying a duffel bag and a rifle running from the bank. The man hid briefly behind a parked pickup truck before resuming his flight,

scaling a fence, and disappearing from view. Sitzman did not get a look at the man's face, but provided a general physical description to his dispatcher.

About a half-hour after the robbery and roughly a mile south of the bank, Timothy Stewart unexpectedly appeared at a Subway sandwich shop where his sister-in-law Mary Kay Petitjean worked. Stewart asked Petitjean for a ride but did not tell her where he was going. Stewart told Petitjean to drive north in the direction of the bank. In the meantime, Evansville Police Corporal Timothy Nussmeier had established a perimeter a few blocks from the bank and was checking vehicles for a person matching Sitzman's description of the robbery suspect: a black male, about 5'7" tall, 145 pounds, with short hair, and wearing blue coveralls. When Petitjean arrived at the perimeter checkpoint, Nussmeier directed her to pull over.

Nussmeier observed that Stewart, seated in the front passenger seat, generally matched Sitzman's description of the robbery suspect but was wearing a white shirt and blue pants. Nussmeier asked Stewart who he was, where he was coming from, and where he was headed. Stewart identified himself and told Nussmeier that he and Petitjean had driven from the Subway store and that he had walked to the Subway from 4000 Kathleen Avenue in order to get a ride from Petitjean. Nussmeier was familiar with both locations and knew that the Subway was some twenty-five to thirty blocks from 4000 Kathleen Avenue. Stewart could not give Nussmeier a specific destination, saying only that they were going "up here" or "up this road."

Nussmeier radioed for an eyewitness identification, and Officer Sitzman arrived at the perimeter checkpoint soon after. Because he had not seen the suspect's face, Sitzman could not make a definite positive identification; but as to hairstyle and physical build, he said Stewart was "about a perfect match" with the suspect. Nussmeier radioed for the

assistance of Evansville detectives. He handcuffed Stewart and placed him in the back seat of his squad car where Stewart remained for five or ten minutes.

At approximately 10:30 a.m, one hour after the robbery and some twenty minutes after Petitjean's car had been stopped, Evansville Detectives Dan Winters and Larry Nelson arrived at the checkpoint. Winters removed Stewart from Nussmeier's car and uncuffed him. Unprompted, Stewart said, "Let's get in your car." Stewart got into the back seat of Winters' car and Winters got in the front seat. Stewart then told Winters to "drive" and to "take me downtown." Winters asked him why; Stewart responded, "Well, you're going to arrest me anyway." Winters asked, "Why, are you the bank robber?" Stewart answered "no."

Meanwhile, back at the bank, the white getaway car was found in an alley just west of the bank, driver's door open, keys in the ignition, and a red dye stain in the front passenger side. A cell phone was found on the ground about fifteen to twenty feet from the car. About five or ten minutes after Stewart entered Winters' car, information was relayed to the officers at the perimeter checkpoint that the cell phone recovered near the scene of the crime belonged to one Timothy Stewart of 4000 Kathleen Avenue. Winters then removed Stewart from the car, handcuffed him, and returned him to the back seat. Stewart was not told he was under arrest and no *Miranda* warnings were given, although the parties now agree that at this point Stewart was under arrest.

Detectives Nelson and Winters left the checkpoint with Stewart at about 10:40 a.m. During the five-minute drive to the police station, the detectives questioned Stewart about the robbery. Stewart denied any involvement. When they arrived at the station, Stewart was placed in an interview room and the handcuffs were removed. Nelson and Winters

again asked Stewart if he was involved in the robbery. Stewart continued to deny involvement, but asked the detectives if he would be charged if he told them who had committed the robbery. Nelson told Stewart that he would be "all right" as long as he had no direct involvement in the robbery himself. Stewart then told the detectives that a man named Duel Felders committed the robbery and that he had provided Felders with the gun and the getaway car. The detectives advised Stewart that his cell phone had been recovered; Stewart said Felders had used his phone and must have left it in the car.

About five or ten minutes into the station-house interview, Winters left the room and Nelson and Stewart were joined by FBI Special Agents Martin Williams and James Beck. Shortly thereafter, Stewart broke down in tears and admitted to committing the robbery alone. At that point Nelson advised Stewart of his rights under *Miranda*.[1] At 11:05 a.m. Stewart signed a waiver of rights form. The questioning then continued for over an hour, and Stewart ultimately agreed to make a tape-recorded statement.

Stewart's tape-recorded statement began at 12:10 p.m. and ended at 12:38 p.m. During this statement, Stewart was occasionally asked about admissions made and information provided earlier in the interrogation. For example, early on in the recorded statement, Nelson asked Stewart, "You have admitted to committing that robbery, is that correct," and Stewart answered "yes." Also, referring to Stewart's admission that he stole the getaway car from a car dealership, Nelson asked Stewart, "You had told us that you had test drove that car," and Stewart answered "yes." It is not clear from the record whether these references to earlier admissions

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

pertain to Stewart's pre-*Miranda* or post-*Miranda* statements to police.

Stewart's trial counsel moved to suppress Stewart's confession, arguing that it was involuntary because he was intoxicated and because the police promised him leniency if he cooperated in the investigation. Although Stewart testified at the suppression hearing that "the FBI guy" told him that he "wouldn't be charged with the gun [offense]" if he cooperated, Agent Williams testified that no such representations or promises of any sort were made. Stewart also testified that he had consumed twelve ounces of Crown Royal that morning, but the officers said he showed no signs of intoxication. The district court found that there was no credible evidence of intoxication or promises of leniency and concluded that Stewart's statements to police following his *Miranda* waiver were voluntary and admissible.

Stewart's taped confession was admitted in evidence and played for the jury during trial. Near the close of the government's case in chief, Stewart's attorney advised the district court that a bank surveillance videotape of the robbery had been partially erased by the prosecutor. Although the videotape was listed on the government's exhibit list, the prosecutor announced his intention not to offer it in evidence, and rested his case. Stewart's attorney said she wanted the videotape admitted, but would like an opportunity to confer with Stewart first. A recess was taken, and when court reconvened, Stewart's attorney announced that the defense would rest without introducing any evidence. She did not request an evidentiary hearing to determine how the videotape was partially erased, nor did she request a missing evidence jury instruction. The jury returned a guilty verdict on both counts, and Stewart was sentenced to 159 months in prison.

## II.  Discussion

### A.  Ineffective Assistance of Counsel

Stewart argues that he was arrested without probable cause and that his trial attorney was ineffective in not moving to suppress his confession as the poisonous fruit of his unlawful seizure. He also argues that counsel was ineffective in failing to move for a *Brady* hearing or request a missing evidence instruction regarding the partially erased videotape.

Sixth Amendment ineffective assistance of counsel claims are often raised collaterally in a petition under 28 U.S.C. § 2255 to allow for supplementation of the record with evidence pertinent to the asserted attorney error. *Galbraith v. United States*, 313 F.3d 1001, 1007-08 (7th Cir. 2002); *McCleese v. United States*, 75 F.3d 1174, 1178 (7th Cir. 1996). However, where a defendant confines his claim to the existing record and is represented by different counsel on appeal, an ineffective assistance of counsel argument is proper on direct appeal. *McCleese*, 75 F.3d at 1178. That is the case here.

A defendant claiming that his counsel was constitutionally ineffective is up against a strong presumption that counsel provided adequate assistance and exercised reasonable professional judgment. *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2065-66, 80 L.Ed.2d 674 (1984); *United States v. Pergler*, 233 F.3d 1005, 1009 (7th Cir. 2000). The familiar *Strickland* test requires Stewart to show that his attorney's performance was deficient and that the deficient performance was prejudicial. *Strickland*, 466 U.S. at 690-91; *Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir. 2004).

### 1.  Fourth Amendment violation

To satisfy the *Strickland* test where the asserted attorney error is a defaulted Fourth Amendment claim, a defendant must first prove that the Fourth Amendment claim is mer-

itorious. *United States v. Jackson*, 103 F.3d 561, 573 (7th Cir. 1996). Stewart concedes that his initial stop was justified by reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and also does not challenge his brief detention while Corporal Nussmeier waited for an eyewitness identification. He argues that once Officer Sitzman arrived and failed to positively identify him, the basis for his continued detention was eliminated.

We disagree. The initial suspicion did not dissipate upon Sitzman's arrival at the checkpoint. Stewart matched the suspect's general description, was stopped within a few blocks of the crime scene, and had only a vague explanation for where he was going. It is true that Sitzman could not make a completely positive identification because he had not seen the suspect's face. But Sitzman declared that Stewart was "about a perfect match" with the suspect's hairstyle and physical build. This heightened rather than eliminated the initial suspicion, justifying Stewart's continued brief detention while detectives were summoned.

Stewart also argues that the level of suspicion did not justify the amount of restraint used when Nussmeier handcuffed him and placed him in the back seat of his squad, an act which Stewart claims transformed the *Terry* stop into a formal arrest. By the time Detective Winters arrived and removed the handcuffs, Stewart had been detained in Nussmeier's squad for about ten minutes.

The fault line between an investigative detention and an arrest is flexible and highly fact-intensive: "Given the 'endless variations in the facts and circumstances,' there is no 'litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop' and becomes an arrest." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983)). "[T]he crux of our inquiry is whether the nature of the restraint imposed meets the Fourth

Amendment's standard of objective reasonableness." *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). The permissible scope of a *Terry* stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars. *Id.*; *Tilmon*, 19 F.3d at 1224-25.

In *Vega* we held that a *Terry* stop did not become an arrest when officers drew their weapons and detained a suspect in a squad car for over an hour. *Vega*, 72 F.3d at 515. We noted that the officers believed the suspect was dangerous and that the circumstances of the case—which involved a "massive" cocaine conspiracy—made the duration and manner of the stop reasonable. *Id.* Similarly, in *Tilmon* we affirmed the reasonableness of a stop of an armed bank robbery suspect in which officers completely surrounded the suspect's car and drew their guns. *Tilmon*, 19 F.3d at 1226.

Common to both *Vega* and *Tilmon* was our recognition of the officers' reasonable belief that the suspect was potentially dangerous. "To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio.*" *Id.* at 1226 (quoting *United States v. Maslanka*, 501 F.2d 208, 213 n.10 (5th Cir. 1974)). Similar considerations are at work here. The bank robbery was less than an hour old, and Stewart matched the best description of the suspect that the officers possessed. The robbery suspect wielded a semiautomatic rifle and committed a crime of violence. Stewart behaved suspiciously, giving a vague and implausible story about where he had come from and where he was going.

Under these circumstances, it was not unreasonable for the officers to handcuff and detain Stewart in the squad car for ten minutes pending the arrival of detectives; their action in this regard did not transform Stewart's temporary

detention into an arrest.[2] A motion to suppress Stewart's confession as the fruit of an illegal arrest would have failed on the merits. Stewart's counsel cannot have been ineffective for failing to pursue what we have concluded would have been a meritless suppression motion. *Jackson*, 103 F. 3d at 573.

## 2. *Brady* claim and "missing evidence" instruction

Stewart also argues that his attorney's performance was deficient because she failed to assert a *Brady* violation or request a "missing evidence" jury instruction regarding the partial erasure of the surveillance videotape. A claim that the government failed to preserve evidence is not governed by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) but, rather, by the more rigorous standard established in *Arizona v. Youngblood*, 488 U.S. 51, 56-58, 109 S.Ct. 333, 102 L.Ed.2d (1988). This requires the defendant to demonstrate: "(1) bad faith on the part of the government; (2) that the exculpatory value of the evidence was apparent before the evidence was destroyed; and (3) that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Aldaco*, 201 F.3d 979, 982-83 (7th

---

[2] Stewart also briefly suggests that his detention became illegal once the detectives arrived because they had information from certain witnesses at the bank that the robber was six-feet tall. Stewart claims he should have been released because he is only 5'7". But when the detectives arrived, they removed Stewart from the squad car and also removed the handcuffs; it was Stewart *himself* who then asked to get in Detective Winters' car and be taken downtown. He was not handcuffed again until a few moments later when the detectives learned that his cell phone had been found at the scene. At this point (the parties agree), Stewart was under arrest based on adequate probable cause.

Cir. 2000) (quoting *United States v. Watts*, 29 F.3d 287, 289-90 (7th Cir. 1994)).

On this aspect of his ineffective assistance of counsel claim Stewart is boxed in by his election to assert the claim on direct review rather than in a § 2255 collateral proceeding. There is no evidence in the record about the circumstances surrounding the partial erasure of the videotape, the content of what was erased, and the nature and quality of the images that remained on the tape. We have no record upon which to evaluate the defense attorney's decision to abandon the issue of the partially erased videotape. The record reflects only that she raised the subject of the videotape with the district court when the government rested its case, and then asked for a recess to confer with Stewart. When court resumed, Stewart's attorney rested the defense case without introducing any evidence. Without a supplementary evidentiary record, Stewart cannot carry his burden of demonstrating that his attorney mishandled the issue of the videotape.

## B. *Miranda* Violation and Voluntariness of Confession

Stewart argues that his confession should have been suppressed for two additional reasons: (1) the police used a two-step interrogation process in which *Miranda* warnings were initially withheld, in violation of *Miranda* and the Supreme Court's recent decision in *Missouri v. Seibert;* and (2) the confession was involuntary because it was induced by a promise of leniency. The latter argument is perfunctory and meritless. Stewart claims he was duped into initially confessing "indirect" and then "direct" involvement in the robbery by Detective Nelson's representation that he would not be charged if he had no direct involvement in the crime. The detective's offhand remark that Stewart would be "all right" if he had no direct involvement in the robbery cannot

reasonably be construed as a promise of leniency and was not otherwise coercive.

Stewart's challenge to the two-step interrogation is not so easily resolved. The parties agree that Stewart was in custody when he was handcuffed and returned to the back seat of Detective Winters' car after the detectives learned that the cell phone recovered at the crime scene belonged to him. *Miranda* warnings were not given, but Stewart was questioned by police during the five-minute ride to the police station, and the questioning continued in an interview room at the station for another ten minutes or so. During this unwarned phase of the interrogation, Stewart initially denied involvement, then admitted to assisting the perpetrator (to the extent of providing the gun and the getaway car), and then confessed to robbing the bank alone. At this point the police provided *Miranda* warnings, obtained a waiver of rights, and elicited a detailed confession which was subsequently tape-recorded.

Although he did not raise the issue in the district court, Stewart argued in his opening brief on appeal that the police violated *Miranda* when they elicited an unwarned confession and then, mid-interrogation, interjected *Miranda* warnings and secured a postwarning repetition of his confession. His position on this issue was considerably strengthened when the Supreme Court decided *Missouri v. Seibert* while this appeal was being briefed. At issue in *Seibert* was the admissibility of a confession obtained by the use of a two-step interrogation strategy that called for the deliberate withholding of *Miranda* warnings until the suspect confessed, followed by a *Miranda* warning and a repetition of the confession already given.

The interrogating officer in *Seibert* testified that he made a "conscious decision" to use "an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's

already provided once.'" *Seibert*, 124 S.Ct. at 2606. Although five members of the Court held the postwarning confession inadmissible under these circumstances, the case did not produce a majority opinion. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)); *see also Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 715 n.20 (7th Cir. 2003). A close reading of the separate opinions in *Seibert* reveals at least some common legal ground.

A plurality of the Court held that *Miranda* warnings given mid-interrogation, after a suspect has already confessed, are generally ineffective as to any subsequent, postwarning incriminating statements.[3] *Seibert*, 124 S.Ct. at 2605. The plurality held that the police interrogation technique known as "question first" did not serve *Miranda*'s purpose of informing suspects about their constitutional rights: "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Seibert*, 124 S.Ct. at 2610. When police question first and warn later, the threshold inquiry, according to the plurality, is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* The plurality was skeptical: "[I]t is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in

---

[3] Justice Souter wrote the plurality opinion and was joined by Justices Stevens, Ginsburg, and Breyer.

preparing the suspect for successive interrogation, close in time and similar in content." *Id.* This is because a suspect who had just admitted guilt "would hardly think he had a genuine right to remain silent." *Id.* at 2611.

The plurality distinguished *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), essentially limiting it to its facts. *Id.* at 2611-12. *Elstad* addressed the admissibility of a *Mirandized* station-house confession that was preceded by an earlier, unwarned inculpatory remark by the defendant at the scene of his arrest. The defendant in *Elstad* was arrested at his home in connection with a recent neighborhood burglary. As police were executing the arrest warrant, and while still in the defendant's living room, one of the officers explained to the defendant that he was suspected of being involved in burglarizing his neighbor's home. *Elstad*, 470 U.S. at 301. The defendant told the officer, "Yes, I was there." *Id.* He had not yet received *Miranda* warnings. Later, at the sheriff's headquarters, the defendant was fully *Mirandized*, waived his rights, and gave an incriminating statement. *Id.*

The Supreme Court held in *Elstad* that the failure to administer *Miranda* warnings prior to the defendant's initial inculpatory statement did not require suppression of his subsequent *Mirandized* confession. *Elstad*, 470 U.S. at 300. Because the Fourth Amendment exclusionary rule is different in purpose and effect from the *Miranda* suppression rule, the Court refused to extend the Fourth Amendment "fruits" doctrine to the Fifth Amendment *Miranda* context:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda*

> requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 310.

The Court also refused to attribute constitutional significance to the "psychological effects" of a voluntary unwarned admission, reiterating that "[t]he failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Id.* at 310-11. If a prior statement has actually been coerced, "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over to the second confession." *Id.* at 310. However, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" as to the second statement. *Id.* at 314. Where the initial unwarned statement was voluntary, the admissibility of the second statement depends only on whether it, too, was voluntary, and obtained in compliance with *Miranda*. *Id.* at 318. Thus, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.*

The *Seibert* plurality followed *Elstad* to the extent that it rejected application of the Fourth Amendment "fruits" doctrine to the testimonial fruits of a *Miranda* violation.[4]

---

[4] In *United States v. Patane*, ___ U.S. ___, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004), released with *Missouri v. Seibert*, the Supreme

(continued...)

*Seibert*, 124 S.Ct. at 2610 n.4. However, the plurality distinguished the police conduct at issue in *Elstad* from the deliberate use of a question-first interrogation strategy: "Although the *Elstad* Court expressed no explicit conclusion about either officer's state of mind, it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Id.* at 2612. The plurality characterized the facts in *Seibert* as presenting "the opposite extreme . . . which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings."[5] *Id.* The plurality distilled from these extremes a list of factors that may inform a court's judgment on whether mid-interrogation *Miranda* warnings are effective in individual cases:

> The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

---

[4]  (...continued)
Court held that the failure to give *Miranda* warnings does not require suppression of the physical fruits of the suspect's unwarned but voluntary statements.

[5]  The plurality emphasized that its conclusion in this regard did not turn on the subjective intent of the officer: "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here . . . the focus is on facts apart from intent that show the question-first tactic at work." *Seibert*, 124 S.Ct. at 2612 n.6.

*Id.* at 2612. Applying these factors to the case before the Court, the plurality concluded that the delayed *Miranda* warnings were ineffective and the statements made after they were delivered were inadmissible. *Id.* at 2613.

Justice Breyer wrote separately to state his preference for a "fruits" rule and a good-faith exception to two-stage interrogations: "Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." *Seibert*, 124 S.Ct. at 2613 (Breyer, J., concurring). He joined the plurality in full, however, predicting that "the plurality's approach in practice will function as a 'fruits' test," in that the "truly 'effective' *Miranda* warnings on which the plurality insists . . . will occur only when certain circumstances—a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning—intervene between the unwarned questioning and any postwarning statement." *Id.*

Justice Kennedy also concurred, but took a different approach to the analysis of *Mirandized* confessions that follow unwarned incriminating statements. Justice Kennedy viewed the plurality's test for admissibility as too broad, calling for a multifactor objective inquiry into the "effectiveness" of midstream *Miranda* warnings in all cases involving two-stage interrogations. *Seibert*, 124 S.Ct. at 2614 (Kennedy, J., concurring). He rejected the general proposition that a *Miranda* violation in connection with one statement necessarily threatens the admissibility of other statements taken in full compliance with *Miranda*: "[I]t would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning." *Id.* at 2615.

Justice Kennedy narrowed the focus to the *deliberate* circumvention of *Miranda*. "The *Miranda* warning was withheld [from Seibert] to obscure both the practical and legal

significance of the admonition when finally given." *Id.* He favored the following rule: "When an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* The sufficiency of the curative measures would depend upon their capacity to "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning." *Id.* at 2616. Justice Kennedy suggested that "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* He added that providing the suspect with an explanation of the likely inadmissibility of the unwarned statement "may be sufficient" as a curative measure. *Id.*

Justice Kennedy made it clear, however, that he would apply this test "only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* That is, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id.* On the facts before the Court, he concluded that the question-first tactic represented an "intentional misrepresentation of the protection that *Miranda* offers and does not serve any legitimate objectives that might otherwise justify its use." *Id.* at 2615. Because no curative steps were taken, Justice Kennedy joined the plurality in concluding that the defendant's postwarning statement was inadmissible. *Id.* at 2615-16.

Justice O'Connor dissented in *Seibert*, joined by Chief Justice Rehnquist and Justices Scalia and Thomas. The dissenting justices would have evaluated the two-step inter-

rogation under the voluntariness standard established in *Elstad*. "*Elstad* commands that if Seibert's first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances." *Seibert*, 124 S.Ct. at 2619 (O'Connor, J., dissenting). Under *Elstad*, if the first statement was voluntary (or if involuntary, the change in time and circumstances removed the taint), then the second statement is admissible unless it was involuntary despite the *Miranda* warning. *Id.*

What emerges from the split opinions in *Seibert* is this: at least as to *deliberate* two-step interrogations in which *Miranda* warnings are intentionally withheld until after the suspect confesses, the central voluntariness inquiry of *Elstad* has been replaced by a presumptive rule of exclusion, subject to a multifactor test for change in time, place, and circumstances from the first statement to the second. According to the plurality, the multifactor test—timing and location of interrogations, continuity of police personnel, overlapping content of statements, etc.—measures the "effectiveness" of midstream *Miranda* warnings and applies in all cases involving sequential unwarned and warned admissions. In Justice Kennedy's view, however, an inquiry into change in time and circumstances between the prewarning and postwarning statements—what he called "curative steps"—is necessary only in cases involving the deliberate use of a two-step interrogation strategy calculated to evade the requirements of *Miranda*. Justice Kennedy thus provided a fifth vote to depart from *Elstad*, but only where the police set out deliberately to withhold *Miranda* warnings until after a confession has been secured. Where the initial violation of *Miranda* was not part of a deliberate strategy to undermine the warnings, *Elstad* appears to have survived *Seibert*.

As we have noted, Stewart did not raise the two-step interrogation argument in the district court. This forfeiture means we review the district court's admission of the

postwarning confession for plain error. *United States v. Olano*, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Westmoreland*, 240 F.3d 618, 635 (7th Cir. 2003). We will not correct a forfeited error unless it is "plain" (that is, clear under current law) and affects substantial rights, which usually equates to a finding of prejudice. *Olano*, 507 U.S. at 732-34. Satisfaction of this standard permits but does not require reversal. We will exercise remedial discretion to correct a plain forfeited error affecting substantial rights only when "the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736. An error may be "plain" for purposes of the *Olano* test if it is clear at the time of appellate review: "[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that the error be 'plain' at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

*Seibert* was decided while this appeal was being briefed. Both parties cited and analyzed the case—Stewart in his reply brief, the government by supplemental submission—and discussed it during oral argument. If Stewart's postwarning confession was inadmissible under either *Seibert* or what remains of *Elstad* (more on this in a moment), then its use against him at trial was plain error under *Johnson*, 520 U.S. at 468 ("it is enough that the error be 'plain' at the time of appellate consideration").

We also conclude that the error—if there was one—affected Stewart's substantial rights. A confession is powerful evidence in any case; in the circumstances of this case, the admission of the confession was clearly prejudicial. Stewart confessed in considerable detail, explaining how he stole the getaway car, acquired the rifle from an illegal gun seller in Kentucky, and bought the clothing and skeleton mask at local discount stores. He provided a thorough description of his actions before, during, and after the robbery. The tape-

recorded confession was played for the jury and a transcript provided so jurors could better follow what Stewart is heard saying on the tape. The confession most certainly had a profound effect on the verdict. There was other evidence against Stewart, to be sure: the partial identification by Officer Sitzman; his cell phone at the crime scene; his strange story of having walked twenty-five blocks to get a ride to nowhere. Still, the admission of Stewart's taped confession substantially affected the outcome of the trial; if it was admitted improperly, it seriously affected the fairness and integrity of the trial.[6]

On the record before us, however, we cannot determine whether the admission of Stewart's confession was improper under *Seibert*, or, if not improper under *Seibert*, whether the initial unwarned confession would flunk the voluntariness standard of *Elstad* such that the taint would carry over to the second warned confession. More specifically, the record does not speak to whether the two-step interrogation in this case was deliberately used in circumvention of *Miranda.* If it was, then the analysis of the *Seibert* plurality and Justice Kennedy's concurrence merge, requiring an inquiry into the sufficiency of the break in time and circumstances between the unwarned and warned confessions.

Much of this evidence is already in the record, and it does not point to a separation of time and circumstances between the two confessions. We know, for example, that the

---

[6] Stewart also suggests, quite summarily, that his counsel's forfeiture of the two-step interrogation issue in the district court constituted ineffective assistance of counsel. But "[t]he Sixth Amendment does not require counsel to forecast changes or advances in the law." *Valenquela v. United States*, 261 F.3d 694, 700 (7th Cir. 2001) (quoting *Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993)). We cannot fault Stewart's counsel for not predicting the Supreme Court's split decision in *Seibert*.

unwarned questioning occurred in the squad car on the way to the police station, continued at the station, and was conducted primarily by Detective Nelson, initially with the assistance of Detective Winters and then two FBI agents. We know that it was Nelson who delivered the *Miranda* warnings and continued the interrogation after Stewart's waiver. But the record does not include the content of the hour-long postwarning interrogation that preceded the tape-recorded confession or the actual content of Stewart's unwarned confession. We therefore can only speculate about the extent to which the three statements overlap and the extent to which the questions treated the interrogation as continuous, although continuity and overlap seem likely. If the sequential interrogation process was used in deliberate circumvention of *Miranda* and there is insufficient separation in time and circumstances between the unwarned and warned confessions, then the warned confession was improperly admitted and Stewart's conviction cannot stand. *Cf. United States v. Aguilar*, 384 F.3d 520, 2004 WL 2026780 (8th Cir. 2004) (treating the plurality in *Seibert* as the decision of the Court but finding enough evidence in the record to determine violation of *Miranda* under both the plurality opinion and Justice Kennedy's concurrence.)

If, on the other hand, the interrogation process at work here was not a deliberate end run around *Miranda*, then Stewart's first statement must be evaluated for voluntariness under *Elstad*. If involuntary, then the same sort of inquiry into change in time and circumstances between the first and subsequent statements will determine whether Stewart's tape-recorded confession was properly admitted.

### III.  Conclusion

Accordingly, for the foregoing reasons, we AFFIRM the district court's conclusion that Stewart's postwarning confession was voluntary, and reject Stewart's claims of ineffective assistance of counsel. On the issue of the admissibility

of the confession under *Missouri v. Seibert,* we REMAND the case to the district court for further proceedings consistent with this opinion.


A true Copy:

   Teste:


_____
***Clerk of the United States Court of Appeals for the Seventh Circuit***