2008 VT 118

# State of Vermont v. Timothy Fleurie

[968 A.2d 326]

No. 07-190

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 5, 2008

30

*Kyle Sipples*, Caledonia County Deputy State's Attorney, Saint Johnsbury, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant appeals the Caledonia District Court's partial denial of his motion to suppress his confession to assault and robbery. The court suppressed statements defendant made in his home before he was given *Miranda* warnings, but did not suppress subsequent statements made after officers administered *Miranda* warnings at the police station. See *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Defendant asserts that the court erred by admitting his confession at the police station because it was obtained in violation of his Fifth Amendment rights. Defendant does not argue that the officers violated the rights guaranteed to him by Article 10 of the Vermont Constitution. We affirm.

¶ 2. The undisputed facts on appeal are as follows. During an afternoon vehicle patrol on January 26, 2006, two St. Johnsbury police officers noticed defendant, an eighteen-year-old male they recognized from prior encounters, at the intersection of Railroad Street and Bagley Street. Not suspecting any wrongdoing, the officers drove on. Within ten minutes after observing defendant,

the officers received a report of a robbery at Landry's Drug Store on Railroad Street. A witness at the scene gave a description of a robber armed with a gun, wearing a face mask, sweatshirt, and jeans with a distinctive yellow emblem sewn on the back pocket.

¶ 3. Because the witness' description of the clothes matched those worn by defendant, whom they had just seen, the officers proceeded to defendant's mother's apartment, which was only a few minutes' walk from the drug store, and where one of the officers knew he lived. One officer knocked on the front door while the other proceeded around the house to watch the back door. By the time defendant's mother opened the door, at least four officers and two police cruisers were at the scene. One officer told defendant's mother that they were investigating an armed robbery and asked permission to speak with her son inside the apartment. Permission was granted.

¶ 4. Officer Bickford saw that defendant was wearing jeans with a distinct yellow insignia on the rear pocket. Officer Bickford told defendant that he matched the description of a suspect in an armed robbery. Defendant replied that he had no guns or mask, a statement Officer Bickford found significant because he had not mentioned the details of the robbery to defendant. Without administering *Miranda* warnings, Officer Bickford then proceeded to question defendant about his whereabouts during the day. Defendant denied leaving the apartment. When defendant asked for a cigarette and moved towards the kitchen to get one, the officer told him to stay where he was and that he was not allowed to smoke. Officer Bickford told defendant that the officers had seen him outside walking near the drug store. Defendant again denied being outside that day. To this the officer responded: "C'mon, I know you were outside. I saw you"; "C'mon, tell the truth"; and "Tell me what you really did." For approximately ten minutes, Officer Bickford continued this line of questioning. Defendant again asked if he could smoke, and was again denied. At no time did any of the officers unholster their guns or get out their handcuffs. None of the officers touched or searched defendant.

¶ 5. At some point, Officer Maurice came in through the back door and asked defendant why there was a puddle of water — presumably from melted snow — on the floor under his boots if he had not been outside that day. Defendant then acknowledged that he had been out very briefly to see his girlfriend. The trial

court found that this statement was incriminating because it placed defendant outside the apartment in the same general time and area where the crime had occurred. During the questioning in the apartment, defendant did not make any other admissions and continued to deny any involvement in the robbery.

¶ 6. About midway through the interrogation, Officer Bickford noticed the odor of alcohol and asked defendant if he would submit to a preliminary breath test. Defendant agreed. The test results indicated a blood alcohol content of 0.04. At this point the officers decided to arrest defendant for an underage-drinking violation, 7 V.S.A. § 657(a)(3), but did not inform defendant of this.[1] Officer Bickford questioned defendant about the robbery for an additional thirty minutes before bringing him to the police station, a few minutes' drive from the apartment.

¶ 7. The officers did not question defendant while he was in the police cruiser. At the police station, an officer handcuffed defendant to a wall while waiting for defendant's mother to arrive on foot. Officer Maurice informed defendant of his *Miranda* rights for the first time. When his mother arrived, defendant waived his *Miranda* rights and confessed to participating in the robbery.

¶ 8. Defendant moved to suppress the statements he made during the initial interrogation in his home, as well as the statements he made later at the police station. The State opposed this motion, arguing that defendant was not "in custody" when he was interviewed in his home, and, since *Miranda* applies only to "custodial police interrogation," the statements were admissible. The trial court found that while the questioning at the home may "have begun as an investigative detention . . . the situation transformed itself into a full scale interrogation." It concluded that, "[g]iven the totality of the circumstances . . . this was a custodial interrogation. The failure to give *Miranda* warning[s] requires suppression of the statements defendant made within his home."

¶ 9. Relying on *Oregon v. Elstad*, 470 U.S. 298 (1985), however, the trial court concluded that the confession given after the *Miranda* warnings was admissible. In support of this conclusion, the court found that there was "no sign defendant's will was overborne, or that there were threats made, or any overreaching

---

[1] The underage-drinking charge, along with a violation-of-conditions-of-release charge, see 13 V.S.A. § 7559(e), were later dropped.

by the officers, or any of the psychological pressure games." The court also noted that there was no showing that defendant waived his *Miranda* rights as a result of coercion or overbearing tactics, stating that "[d]efendant's waiver of *Miranda* rights was a rational, informed and voluntary decision." Moreover, the court found that defendant's admission during the initial interrogation that he was outside the house at the same time and in the same general vicinity of the robbery, while somewhat incriminating, was not "a full confession which rendered further denial of involvement all but impossible to sustain." Defendant entered a conditional plea of guilty to the robbery charge, reserving his right to appeal the partial denial of his motion to suppress.

¶ 10. The sole issue raised on appeal is whether the trial court erred in concluding that the confession obtained at the station was admissible. "A motion to suppress evidence presents a mixed question of fact and law. While we uphold the trial court's factual findings absent clear error, we review the trial courts conclusions of law de novo." *State v. Bauder*, 2007 VT 16, ¶ 9, 181 Vt. 392, 924 A.2d 38.

██ ██ ¶ 11. The Fifth Amendment gives every citizen the right not to be "compelled in any Criminal Case to be a witness against himself." U.S. Const. amend. V. To protect this right, law enforcement officers must warn a person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. *Miranda* warnings serve to ensure that a person has sufficient knowledge of his constitutional rights and that any waiver of those rights is knowing, intelligent, and voluntary. *Id.* at 444-45. Because defendant does not invoke Chapter I, Article 10 of the Vermont Constitution and does not argue that we should diverge from federal precedent, we analyze his claims under the Fifth Amendment.

¶ 12. This dispute requires us to consider in detail the Supreme Court's decisions in *Elstad* and *Missouri v. Seibert*, 542 U.S. 600 (2004). Both of these cases addressed situations in which defendants received *Miranda* warnings only after the police had already begun questioning them. Defendant argues that *Seibert* is controlling and requires the exclusion of his post-*Miranda* confession. The State asserts that the confession is admissible under *Elstad*

and that *Seibert* is inapplicable. The State further argues that, even if *Seibert* did control, defendant has failed to show that the post-*Miranda* statements should be excluded.

¶ 13. In *Elstad*, a witness contacted the police and reported that Elstad, an eighteen-year-old male, had committed a burglary. After obtaining a warrant for Elstad's arrest, two police officers drove to Elstad's home. Elstad's mother answered the door and led the officers to Elstad's room. The officers asked Elstad to get dressed and to accompany them into the living room. While one officer talked to Elstad's mother in the kitchen, the other officer briefly questioned Elstad about the burglary without administering *Miranda* warnings. According to the officer's testimony, the extent of the interrogation was as follows:

> "I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.' "

470 U.S. at 301. The government conceded that Elstad was in custody at the time of this interrogation. The officers then brought Elstad to the police station, and, approximately one hour later, advised Elstad for the first time of his *Miranda* rights. Elstad waived his rights and gave a full written confession to participating in the burglary. Elstad conceded that the officers did not make any threats or promises either at his residence or at the police station.

¶ 14. At trial, Elstad moved to suppress the statement, "Yes, I was there," made to the police officer at his house. He also moved to suppress his subsequent confession because, after the first admission "let the cat out of the bag," his stationhouse confession was "fruit of the poisonous tree." *Id.* The trial judge suppressed the pre-*Miranda* statement, but admitted the post-*Miranda* confession. On appeal, the Oregon appellate court reversed, noting that the "taint" from the first statement had not yet dissipated when the confession was given. *Id.* at 302-03. The Oregon Supreme Court denied review. The U.S. Supreme Court

granted certiorari to resolve whether the "Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Id.* at 303. The Court concluded:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.

*Id.* at 314. In *Elstad,* the government conceded that the defendant's pre-*Miranda* statement, "Yes, I was there," was properly excluded as obtained in violation of *Miranda. Id.* at 302.

■■■ ¶ 15. The Supreme Court held that, despite the officers' initial failure to administer *Miranda* warnings, Elstad's post-warning confession remained admissible: "[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Id.* at 308. The Court continued, "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309. The Court concluded that Elstad's waiver of his rights and his subsequent written confession were given freely and voluntarily, not as a result of police coercion. *Id.* at 315. A simple failure "without more," *id.* at 300, to administer warnings will not preclude the admissibility of statements made subsequent to a voluntary and informed waiver.[2] *Id.* at 309. But, the *Elstad* Court warned, if the failure to administer warnings was accompanied "by any actual coercion or other circumstances calculated to undermine the

---

[2] In *State v. Badger,* we stated that intervening *Miranda* warnings alone did not render a subsequent confession admissible. 141 Vt. 430, 440, 450 A.2d 336, 342 (1982). We noted that the State had the burden of showing that the waiver was voluntary. *Id.* at 441, 450 A.2d at 343. *Elstad* held that technical violations of *Miranda* do not warrant a presumption of compulsion, and that *Miranda* warnings "ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad,* 470 U.S. at 314.

suspect's ability to exercise his free will," a court might be compelled to exclude post-*Miranda* confessions.[3] *Id.*

¶ 16. *Seibert*, decided nearly twenty years later, presented just this scenario. In that case, the police woke the suspect, Seibert, at 3:00 a.m. at a hospital where her son was being treated for burns he suffered in a house fire that the police suspected Seibert had set. *Seibert*, 542 U.S. at 604 (plurality opinion). The police arrested Seibert, took her to the police station, and then, following department protocol, deliberately refrained from administering *Miranda* warnings until they had questioned her for between thirty and forty minutes and elicited a full confession. *Id.* at 604-05. After she admitted her guilt and answered extensive and detailed questions, the police gave her a twenty-minute break, issued *Miranda* warnings, and obtained a signed waiver of her rights. *Id.* at 605. The subsequent interrogation rehashed ground covered in the first unwarned interrogation; it was "'largely a repeat of information . . . obtained' prior to the warning." *Id.* at 606. The police pressured Seibert into giving the same responses as she had given earlier, explicitly relying on the earlier confession to goad her into confessing again. *Id.* at 605-06.

¶ 17. The plurality characterized this question-first strategy as designed to undermine the effectiveness of *Miranda* warnings. *Id.* at 609-11. For precisely this reason, the plurality held that the postwarning confession was inadmissible. *Id.* at 617. The plurality rejected the idea that "mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." *Id.* at 611. Once a defendant thoroughly incriminates himself, a midstream warning may fail to "reasonably convey that he could choose to stop talking." *Id.* at 612. According to the plurality, "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively . . . .'" *Id.* at 611-12. "For unless the warnings could place a suspect who has just been

---

[3] The *Elstad* Court reiterated that the "fruit of the poisonous tree" exclusionary rule does not apply to *Miranda* violations. *Elstad*, 470 U.S. at 305-09. The rule originated in *Wong Sun v. United States*, 371 U.S. 471 (1963), where the Court held that evidence discovered as a result of a search conducted in violation of the Fourth Amendment must be excluded. Although this doctrine applies when the fruit of a Fourth Amendment violation is a confession, "a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment." *Elstad*, 470 U.S. at 306.

interrogated in a position to make such an informed choice," the plurality continued, "there is no practical justification . . . for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id.* at 612. Whereas in *Elstad* the officers' failure to give warnings was "arguably innocent neglect" or a "good-faith *Miranda* mistake," the officer's conduct in *Seibert* was at "the opposite extreme" and "by any objective measure reveal[ed] a police strategy adapted to undermine the *Miranda* warnings." *Id.* at 615-16.

¶ 18. To determine whether *Miranda* warnings delivered mid-interrogation could be effective, the *Seibert* plurality outlined five factors: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second statements, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615.

¶ 19. The plurality in *Seibert* observed that the unwarned interrogation was "systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." *Id.* at 616. The warned interrogation occurred in the same location as the unwarned interrogation, it occurred only fifteen to twenty minutes after the first, and it was conducted by the same officer. *Id.* Furthermore, the officer treated the warned interrogation as a continuation of the unwarned interrogation by referring to the earlier confession so much that "a reasonable person in the suspect's shoes would not have understood [the *Miranda* warnings] to convey a message that she retained a choice about continuing to talk." *Id.* at 617. Thus, the plurality held that in Seibert's circumstances, the *Miranda* warnings were inadequate. *Id.*

¶ 20. Justice Kennedy concurred in the judgment, but concluded that the plurality's multi-factor test should not apply in every case of a two-stage interrogation. "[T]his test cuts too broadly. *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity." *Id.* at 622 (Kennedy, J., concurring). Instead, he advocated applying the principles of *Elstad* unless a deliberate "two-step interrogation technique was used in a calculated way to

undermine the *Miranda* warning." *Id.* Justice Kennedy continued, "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* Curative measures, such as a substantial break in time and circumstances, could "allow[] the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* Thus, Justice Kennedy's concurrence prohibits officers from *deliberately* withholding warnings to elicit incriminating statements from a suspect and then using those statements to undermine the efficacy of later *Miranda* warnings. This requires an inquiry into the subjective intent of the interrogating officer. According to both the plurality and Justice Kennedy, the intentional two-step interrogation technique employed in *Seibert* is impermissible because it renders *Miranda* warnings ineffective.

¶ 21. Because there was no majority opinion in *Seibert*, we must first decide which opinion is controlling. It is well settled that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quotation omitted). Justice Kennedy's concurrence is narrower than the plurality's since it does not apply to all two-step interrogations, only those involving intentional police misconduct. See *United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) ("We now join our sister circuits in holding that *Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession."). Under Justice Kennedy's test, the threshold inquiry is whether the police intentionally withheld *Miranda* warnings to circumvent its protections. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). If warnings were not intentionally withheld, both Kennedy and the *Seibert* plurality would apply the *Elstad* framework.

¶ 22. The interrogation in the instant case, while it was a two-step interrogation, was materially different from those in *Elstad* and *Seibert*. *Elstad* involved a very brief questioning that did not seek or obtain a detailed confession. The brief stop in the living room in *Elstad* was not for the purpose of interrogating the

suspect, but rather to give the second officer time to inform Elstad's mother of the reason for his arrest. 470 U.S. at 315. *Seibert* involved intense late-night interrogation at the police station, and the officer in that case conceded at trial that he had deliberately impaired the efficacy of *Miranda* warnings by not giving them until Seibert fully confessed. 542 U.S. at 604-06. When the officer finally administered the *Miranda* warnings, Seibert had already confessed her guilt, the details of the crime, and her subjective intent. *Id.*

■ ¶ 23. Here, the initial unwarned custodial interrogation was no mere oversight or good-faith mistake as in *Elstad*. But neither is it clear that the officers *intended* to undermine the efficacy of *Miranda* warnings, as in *Seibert*. While the initial interrogation was persistent, and at times confrontational, it was not conducted in bad faith or in an abusive manner. In contrast to *Seibert*, the police did not elicit a full confession from defendant before administering *Miranda* warnings, and defendant makes no showing that Officer Maurice attempted to use defendant's prior statements to pressure him into his subsequent confession.[4] Absent a showing that the officers deliberately withheld *Miranda* warnings, the principles of *Elstad* apply. See *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).

¶ 24. In practice, the principles of *Elstad*'s "voluntariness" test and the five factors in the *Seibert* plurality's "effectiveness" test have substantial overlap, and together they operate essentially as a totality-of-the-circumstances analysis. *Elstad* presumes that a defendant's waiver is knowingly and voluntarily made unless the circumstances surrounding the first, unwarned confession were so coercive as to violate not just *Miranda*, but the Fifth Amendment itself. *Seibert* provides a multi-factor test to determine if the circumstances compromised the effectiveness of mid-interrogation *Miranda* warnings. Both effective warnings and a voluntary waiver are needed to safeguard defendants' rights. We conclude that the warned confession here was admissible under *Elstad* and the plurality's test in *Seibert*, that the *Miranda* warnings defend-

---

[4] The "psychological impact" of prior statements that "let the cat out of the bag," without more, does not compel the conclusion that a subsequent confession was compelled. *Elstad*, 470 U.S. at 311-12.

ant received functioned effectively, and that defendant voluntarily waived his *Miranda* rights.[5]

¶ 25. Recently, in *State v. Yoh*, we reached a similar conclusion under different circumstances. 2006 VT 49A, 180 Vt. 317, 910 A.2d 853. In *Yoh*, the *Miranda* violation was not the failure to give warnings, but the continued interrogation after the suspect invoked his right to remain silent and his right to have counsel present. *Id.* ¶ 10. During the second of three interrogations, the police warned Yoh of his rights, and he invoked his right to remain silent. *Id.* ¶ 3. The police impermissibly continued to interrogate him, but did not elicit a confession. Later, Yoh requested a third meeting with the officers, waived his rights, and confessed to the crime. *Id.* ¶¶ 4-5. Relying on *Seibert*, Yoh argued at trial that the *Miranda* violation rendered his confession involuntary. *Id.* ¶ 14. We upheld the admission of the confession because, despite the *Miranda* violation, the evidence clearly indicated that Yoh's subsequent confession was voluntary. *Id.* During the third interrogation, Yoh acknowledged that he was "probably hanging myself, talking to [the police] without a lawyer." *Id.* ¶ 15. He also demonstrated that he understood his right to remain silent when, during his third interrogation, he refused to continue speaking until the detectives allowed him to take a cigarette break. *Id.*

¶ 26. As the *Elstad* Court noted, "[t]here is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question." 470 U.S. at 312. While we recognize that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it," *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977), our inquiry under *Elstad* is

---

[5] As discussed, *supra*, ¶ 15 n.3, the Supreme Court of the United States has declined to apply the fruit-of-the-poisonous-tree analysis to *Miranda* violations. *Elstad*, 470 U.S. at 305-09. Recently, in *State v. Peterson*, we departed from this convention and held that, under Article 10, "[p]hysical evidence gained from statements obtained under circumstances that violate *Miranda* is inadmissible in criminal proceedings as fruit of the poisonous tree." 2007 VT 24, ¶ 28, 181 Vt. 436, 923 A.2d 585. Here we do not decide whether the fruit-of-the-poisonous-tree doctrine applies under Article 10 to confessions gained from *Miranda* violations because we limit our discussion to the Fifth Amendment.

whether the interrogation was *so* coercive as to undermine defendant's ability to voluntarily waive his rights. See *State v. Bacon*, 163 Vt. 279, 294, 658 A.2d 54, 64 (1995) (stating that the question of voluntariness "is not whether statements made by the interrogators were the cause of defendant's confession, but rather whether those statements were so manipulative or coercive that they deprived [defendant] of his ability to make an unconstrained, autonomous decision to confess" (quotation omitted)).

¶ 27. In *Tankleff v. Senkowski*, the United States Court of Appeals for the Second Circuit had occasion to consider this issue. 135 F.3d 235 (2d Cir. 1998). In *Tankleff*, the police questioned a suspect on the morning of his parents' murder for nearly four hours in various locations, including two hours of continuous interrogation in a windowless room at the police station. *Id.* at 240. The police became "increasingly hostile" to defendant as they pressed inconsistencies in his story, openly expressed disbelief, and raised their voices. *Id.* at 240-41. At one point, an officer faked receiving a phone call from a detective at the hospital who reported that one parent had come out of a coma and accused his son of being the attacker. As soon as the son allowed that he could have killed his parents, the police temporarily ceased questioning, administered *Miranda* warnings, and took the son's full confession. The court held that the unwarned interrogation of the suspect "barely" fell short of coercion that would irredeemably taint the second, warned confession. *Id.* at 245. "[C]rucially important" to the court's decision was that there was "no indication in the record that Tankleff did not understand his rights once he was given the warnings or that his subsequent waiver of those rights was anything but knowing and voluntary." *Id.* Similarly, in the instant case, though defendant made somewhat incriminating statements, the police administered *Miranda* warnings prior to defendant's actual confession. Defendant's unwarned interrogation was far less coercive than those in *Tankleff* or *Seibert* and did not "irredeemably taint," *id.*, his ability to voluntarily waive his *Miranda* rights. Furthermore, there is no indication in the record that defendant did not understand his rights when he waived them.

¶ 28. Having concluded that defendant's initial interrogation did not taint his later confession, we now consider defendant's contention that, under the circumstances, the warning he was

given did not effectively convey that he had a right to remain silent. The ensuing analysis is similar to the voluntariness analysis above, and demonstrates that the *Miranda* warnings meaningfully informed defendant of his right to remain silent.

¶ 29. We first consider the level of detail in the officers' questions and defendant's answers — the more detailed the prewarning interrogation, the more difficult it is to later deny culpability. See *Seibert*, 542 U.S. at 615. Here, the record is unclear as to the exact level of detail of the questions asked by the officers, but we are certain that defendant did not volunteer any detailed responses. Defendant made a suspicious remark to Officer Bickford about not having any guns or a mask. Defendant also admitted to being outside of his home at the time of the robbery, but maintained that he was visiting his girlfriend. This statement alone was insufficient to implicate defendant in the robbery of the drug store. Furthermore, he affirmatively denied any involvement in the robbery despite forty minutes of accusations and questions. The minimal level of detail elicited from defendant in the initial questioning suggests that, under the circumstances, the subsequent *Miranda* warnings could operate effectively.

¶ 30. The second factor concerns the degree to which defendant's prewarning and postwarning statements overlapped — the greater the overlap, the stronger the inference that the warnings were ineffective. See *id.* In *Seibert*, the Court found it important that after the first interview, "there was little, if anything, of incriminating potential left unsaid." *Id.* at 616. As noted above, only minimal detail surfaced in the initial interrogation. Defendant admits that his "[postwarning] statements were different than his earlier statements." After defendant was warned, he gave the police a complete admission of guilt. He described how and why he committed the crime and informed the police where he had hidden the gun and mask. The minimal overlap between the information elicited in the two interrogations suggests that the warnings operated effectively.

¶ 31. The third and fourth factors — the timing and setting of the two interrogations and the degree of continuity of police personnel — can signal to a suspect that the postwarning interrogation was a separate and distinct experience, and that he possessed a real choice between exercising or waiving his right to remain silent. *Id.* at 615-16. In this case, the first interrogation

took place in defendant's home, while the second occurred approximately one hour later in the police station — a very distinct setting. At the apartment, Officer Bickford primarily questioned defendant, while at the police station Officer Maurice both administered the *Miranda* warnings and conducted the interrogation. Contrast this to *Seibert*, where the same officer questioned the suspect in an interview room for thirty to forty minutes. *Id.* at 604. Once Seibert confessed, that same officer administered *Miranda* warnings, obtained a signed waiver, and then interrogated her again. *Id.* at 605.

¶ 32. The fifth and final factor concerns the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615. In *Seibert*, the officer gave the suspect the "impression that the further questioning was a mere continuation of the earlier questions and responses . . . by references back to the confession already given." *Id.* at 616. He repeated the previous line of questioning, in his words, "until I g[o]t the answer that she's already provided once." *Id.* at 605-06. The two sessions were treated "as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Id.* at 617. Because defendant here did not confess to the robbery during the initial interrogation, it would have been natural for him to maintain his prewarning contention that he was at his girlfriend's house, without further implicating himself in the robbery. In this respect, the outcome of this case is similar to that in *Yoh*, where we stated that Yoh, "unlike the defendant in *Seibert*, who believed [she] had already confessed prior to giving [her] statement, . . . understood that he was entitled . . . not to answer further questions, but he decided to cooperate anyway." 2006 VT 49A, ¶ 15.

¶ 33. Accordingly, the prewarning interrogation did not render the later *Miranda* warnings ineffective. Defendant's subsequent waiver of his *Miranda* rights was voluntary, and his confession was properly admitted.

*Affirmed.*