HECHT, Justice
(concurring in part and dissenting in part).
I agree the district court erred in allowing the medical examiner to rely primarily upon Tyler’s uncorroborated statements in forming an opinion as to the cause of Baby Tyler’s death. I also agree the district court erred in concluding Tyler had no reasonable expectation of privacy in the hotel room. However, I dissent in part because I- conclude all of Tyler’s statements to the police are inadmissible. The circumstances — especially the officers’ repeated verbal assurances that Tyler was not in custody and their subsequent decision to administer warnings only after Tyler made all of the inculpatory statements they sought — demonstrate a calculated strategy to circumvent Miranda. In my view, the police questioning in this case *178 constitutes a “midstream recitation of warnings after interrogation and unwarned confession” in violation of Missouri v. Seibert, 542 U.S. 600, 604, 124 S.Ct. 2601, 2605, 159 L.Ed.2d 643, 650 (2004) (plurality opinion), and all of Tyler’s statements made during the police station and hospital interrogations should have been suppressed.
Our court has not had occasion to apply Seibert. Thus, this case presents the first opportunity to consider the problem of midstream Miranda warnings in successive interrogations. Seibert was a split 4-1-4 decision, so courts applying it must determine whether the plurality opinion or Justice Kennedy’s concurring opinion provides the controlling rule. See Kuhne v. Commonwealth, 61 Va.App. 79, 733 S.E.2d 667, 673 (2012) (“The Seibert plurality would review all two-step interrogations under a multi-factor test.... Justice Kennedy’s opinion would apply a form of heightened scrutiny only to those two-step cases in which law enforcement officers deliberately employed a two-step procedure designed to weaken Miranda’s protections.”). A majority of federal Circuit Courts of Appeals have adopted Justice Kennedy’s standard, and so have several state courts. See generally id. at 672 & nn. 5-6 (collecting cases); see also State v. Nightingale, 58 A.3d 1057, 1066-67 (Me.2012); State v. Fleurie, 185 Vt. 29, 968 A.2d 326, 332-33 (2008).
I would not expressly adopt either standard in this case because I conclude the officers violated both. See United States v. Aguilar, 384 F.3d 520, 525 (8th Cir.2004) (finding a Miranda violation under both the Seibert plurality opinion and Justice Kennedy’s concurring opinion in the same case); see also United States v. Pacheco-Lopez, 531 F.3d 420, 427 n. 11 (6th Cir. 2008) (same). The officers’ strategy and technique in this case clearly exemplify the use of a “question-first tactic” that subverts Miranda’s rationale, see Seibert, 542 U.S. at 617, 124 S.Ct. at 2613, 159 L.Ed.2d at 658, and epitomizes a “deliberate two-step strategy,” id. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d at 661 (Kennedy, J., concurring in the judgment).
This case involves two successive interrogations: one beginning in the police car and continuing at the police station, and another at the hospital. Tyler received Miranda warnings toward the end of the three-hour police station interrogation only after she made incriminating statements regarding Baby Tyler’s death. After receiving Miranda warnings at the police station, Tyler did not repeat her incriminating statements anew, but simply answered “Yes” as the officers confirmed what she had previously said.[16] She also received additional Miranda warnings at the hospital the next day where she repeated her incriminating statements.
I. Custody Principles.
As a threshold matter, Tyler brings claims under both the Federal and State Constitutions. Because I conclude Seibert *179 is dispositive, I would not reach the question whether the Iowa Constitution provides different standards. Cf. State v. Kooima, 833 N.W.2d 202, 212 (Iowa 2013) (“We do not decide this case under the Iowa Constitution because we resolve this issue based upon the Fourth Amendment of the United States Constitution.”).
Custody for Miranda purposes is ordinarily an objective test that considers the totality of the circumstances. Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994) (per curiam). “[T]he ultimate inquiry is ... whether there is a ‘formal arrest or restraint on freedom of movement’ of the degree associated with a formal arrest.” California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (per cu-riam)). When making this inquiry, courts must keep in mind the purpose of the Miranda rule: to protect individuals from coerced or involuntary self-incrimination. See Seibert, 542 U.S. at 608, 124 S.Ct. at 2608, 159 L.Ed.2d at 652-53 (plurality opinion); Berkemer v. McCarty, 468 U.S. 420, 433, 104 S.Ct. 3138, 3146-47, 82 L.Ed.2d 317, 330 (1984).
Our cases generally examine four factors in determining whether a suspect is in custody:
“(1) the language used to summon the individual;
(2) the purpose, place, and manner of interrogation;
(3) the extent to which the defendant is confronted with evidence of her guilt; and
(4) whether the defendant is free to leave the place of questioning.”
State v. Bogan, 774 N.W.2d 676, 680 (Iowa 2009) (quoting State v. Miranda, 672 N.W.2d 753, 759 (Iowa 2003)). These factors, however, are not exclusive, and no one fact or factor is determinative. State v. Smith, 546 N.W.2d 916, 922 (Iowa 1996) (en banc).
II. Applying Custody Principles to This Case.
Recognizing their primary purpose was to obtain admissions of criminal conduct from the only suspect in their investigation, and understanding the circumstances surrounding the transaction had characteristics of interrogation raising Miranda implications, the officers told Tyler she was free to leave soon after she arrived at the police station and as the questioning began. They told Tyler she was free to leave because they knew a suspect’s freedom to leave the interrogation room is a relevant factor in determining whether that suspect is in custody. See Bogan, 774 N.W.2d at 680; State v. Ortiz, 766 N.W.2d 244, 251-52 (Iowa 2009); accord United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir.1990). But telling Tyler she was free to leave “is not ‘talismanic’ or sufficient in and of itself to show a .lack of custody.” United States v. Hargrove, 625 F.3d 170, 180 (4th Cir. 2010). Actions speak louder than words in this context, and several other factors convince me that Tyler was in custody from the time the officers took her from her residence and should have received Miranda warnings before the questioning began. See People v. Minjarez, 81 P.3d 348, 357 (Colo.2003) (en banc) (declining to credit officers’ assurances the defendant was free to leave “when all external circumstances appear[ed] to the contrary”); Buck v. State, 181 Md.App. 585, 956 A.2d 884, 908 (2008) (finding custody despite “what the detectives said about ... not being under arrest and being free to leave,” in part because the detectives used “catchphrases” in an effort “to create an interrogation that could be labeled non *180 custodial”); see also 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(d), at 737 n. 57 (3d ed. 2007 & Supp. 2014) [hereinafter LaFave] (noting an assurance the suspect is free to leave “will not carry the day where it is, in effect, nullified by other police conduct”).
First, Tyler did not voluntarily contact the police to offer a statement. See Griffin, 922 F.2d at 1351 (“[W]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist.”).
Second, the words the three officers used when they arrived at Tyler’s residence did not constitute a mere invitation for Tyler to come with them to the police station. Within fifteen seconds of Tyler opening the door, one officer told Tyler, “What we’re going to do ... I want to have you go with ... this guy right here. OK. We need to get to the bottom of what’s going on. OK.” The officers discussed waking Cyphers, asking, “He knows what’s going on?” Tyler responded that he did not. One officer stated, “May I ask you why not?” Tyler gave an inaudible response and the officer stated, “There’s no way around this right now, he’s going to know.” Another officer stated, “We need to talk to him” and “We might as well get this over with.” Thereafter, the officer told Tyler, “why don’t you ride with Mike,” another officer. A DCI agent then directed Tyler to a police vehicle.
“If the so-called ‘invitation’ involves the person going to the station in the company of the police, then a finding of custody is much more likely.” 2 LaFave § 6.6(d), at 735. Here, the words spoken at Tyler’s residence communicated the notion that the officers insisted upon speaking with her at the police station about Baby Tyler. See Bogan, 774 N.W.2d at 680 (noting we consider “the language used to summon the individual” when determining whether a suspect was in custody); Ortiz, 766 N.W.2d at 251-52 (same); State v. Werner, 9 S.W.3d 590, 596 (Mo.2000) (en banc) (finding custody when a detective “requested” that a suspect accompany him to the police station and did not tell the suspect he could refuse to do so).
Third, the questions posed to Tyler during the car ride to the police station and soon thereafter at the police station lasted more than three hours. While the duration of three hours certainly is not disposi-tive on the question whether Tyler was in custody, it is nonetheless a relevant consideration. See United States v. Wright, 777 F.3d 769, 775 (5th Cir.2015) (noting length of questioning is an important factor); Bogan, 774 N.W.2d at 680 (noting we consider “the purpose, place, and manner of interrogation” (emphasis added)); see also Aguilar, 384 F.3d at 527 (suppressing a confession in part because the “questioning was not brief’); Payne v. State, 854 N.E.2d 7, 15 (Ind.Ct.App.2006) (finding a Seibert violation when pre-Miranda questioning lasted seven hours).
Fourth, the officers took numerous lengthy breaks during the questioning at the police station and, after each of them, refocused their questions or asked specific follow-up questions about Baby Tyler’s death. They did not accept Tyler’s explanation that Baby Tyler was stillborn. These breaks in the action and accusatory follow-up questions were obviously in furtherance of the officers’ strategy for eliciting admissions establishing Tyler’s guilt on each of the elements of a first-degree murder charge prior to giving the Miranda warnings. See Bogan, 774 N.W.2d at 680 (noting we consider the extent to which a suspect is confronted with evidence of guilt).
*181 To be sure, the lengthy prewarnings session at the police station cannot reasonably be characterized as merely gathering nonsubstantive background facts. Compare State v. Lewis, 299 Kan. 828, 326 P.3d 387, 398 (2014) (finding no Seibert violation because “[t]he pre-warning interview lasted only 10 minutes with nothing of substance revealed”), and State v. Juranek, 287 Neb. 846, 844 N.W.2d 791, 803-04 (2014) (finding no Seibert violation when the prewarnings questions “did not touch upon key points in the investigation”), with Payne, 854 N.E.2d at 15 (finding a Seibert violation because police “waited to advise [the defendant] of her Miranda warnings until she essentially had divulged her entire involvement”). Notably, it was not until after Tyler stated she placed Baby Tyler face down in a bathtub containing water that Agent Roehrkasse left the room and returned with a written Miranda waiver form.[17] He then thoroughly reviewed with Tyler each of the Miranda warnings before eliciting with leading questions all of the details of Tyler’s confession that had previously been methodically extracted from her.
Further, although Tyler was not informed of her arrest on the murder charge before she was taken from the police station to the hospital for medical attention, the record reveals a law enforcement officer was posted outside her hospital room while she was there. See Griffin, 922 F.2d at 1355 (concluding when a suspect was arrested at the end of an interview, the arrest was objective evidence weighing in favor of custody “from the inception of the encounter”); Buck, 956 A.2d at 908 (finding custody even though officers repeatedly told the defendant he was free to leave and did not formally arrest him until after they drove him back home). On these facts, I would conclude Tyler was not free to leave the police station and therefore was in custody.
My conclusion that Tyler was in custody at all times en route to the police station and during the three hours of interrogation conducted after they arrived there is strongly influenced by the circumstances surrounding her physical and mental health. The officers knew from the outset of the questioning that Tyler had given birth at a hotel without medical assistance — indeed, without assistance from anyone — during the previous forty-eight hours. Although Tyler denied a need for medical assistance when the officers inquired, the officers either knew or certainly should have known that she had received no medical care during or after the delivery, and she therefore needed it promptly. There was clearly no urgent need for the interrogation to occur before a physical examination and postnatal medical treatment. Yet, the agents decided to interrogate Tyler as a suspect in a crime first, knowing that she had gone through a very traumatic event the night before.
III. The Seibert Standard.
Because I conclude Tyler was in custody during the entire time she was en route to the police station and during the interrogations conducted there and at the hospital, I would apply Seibert. In Seibert, the Supreme Court’s plurality opinion set forth a number
*182 of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator’s questions treated the second round as continuous with the first.
Seibert, 542 U.S. at 615, 124 S.Ct. at 2612, 159 L.Ed.2d at 657. The police interrogation in this case meets each of those factors. The first round of interrogation was extremely detailed and complete and, as I have noted, the officers did not stop to administer Miranda warnings at the first sign Tyler might be culpable — her admission that Baby Tyler cried. The two statements fully overlap; indeed, the officers simply repeated Tyler’s statements back to her and asked for an acknowledgement that they were correct. As in Seibert, “[t]he warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment.” Id. The same officers conducted both interrogations. Finally, the officers expressly referred to previous statements using phrases such as “you told me” and “you said.” With every one of these factors satisfied, just as in Seibert, this interrogation “by any objective measure reveal[s] a police strategy ... to undermine the Miranda warnings.” Id. at 616, 124 S.Ct. at 2612, 159 L.Ed.2d at 657.
Additionally, the officers took no curative measures once they finally administered warnings. See id. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d at 661 (Kennedy, J., concurring in the judgment) (“If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.”). Only fifteen minutes passed between the prewarning statements and the first Miranda warning at the police station, leaving Tyler insufficient time “to distinguish the two contexts and appreciate that the interrogation ha[d] taken a new turn.” See id.; see also Aguilar, 384 F.3d at 525 (suppressing a confession when the “two interrogations were not separated in time, occurred in the same interrogation room, and the same officers participated in the questioning”). Compare Vasquez v. State, 453 S.W.3d 555, 574-75 (Tex.App.2015) (concluding officers did not undertake curative measures when they provided Miranda warnings after just a short bathroom break), with United States v. Courtney, 463 F.3d 333, 339 (5th Cir.2006) (concluding a properly Miran-dized confession made “more than one year” after an unwarned confession need not be suppressed).
Further, the officers interrogating Tyler did not augment the Miranda warning with an additional disclosure that her previous unwarned statements might be inadmissible against her. See Seibert, 542 U.S. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d at 661. Instead, after administering the Miranda warnings at the police station and at the hospital, the officers expressly brought to Tyler’s attention and actively used the inculpatory statements she had made before the warnings. See Martinez v. State, 272 S.W.3d 615, 626-27 (Tex.Crim.App.2008) (including abstention from reference to the prior statement among a list of nonexhaustive curative measures gleaned from the Seibert plurality and concurring opinions). Thus, no matter which opinion sets forth the controlling Seibert rule, the officers violated it and Tyler’s statements should be suppressed.
*183 IV. Voluntariness.
After watching the video of the police station interrogation in this case, I find Tyler’s physical condition and her emotional state substantially augment the factors mentioned above in creating a custodial environment during all of the questioning. The video establishes beyond dispute that Tyler’s depleted physical condition was accompanied and aggravated by utter emotional despondency. Notwithstanding her obvious physical and extreme emotional vulnerability, however, the officers forged ahead with more than three hours of interrogation. They stopped and took her to the hospital, where she underwent surgery and was treated for blood loss,[18] only after they were confident they had secured admissions supporting the essential elements of first-degree murder. Thus, under the circumstances presented here, I am persuaded that, apart from the Seibert issue, Tyler’s depleted physical and emotional state rendered all of her statements to the officers involuntary. See State v. Alspach, 524 N.W.2d 665, 667 (Iowa 1994) (“A contention that a defendant’s statements were taken in violation of his [or her] Miranda rights and a contention that the statements were not voluntary are separate issues.”).
In determining whether statements are voluntary, we consider “[m]any factors,” including “the defendant’s physical and emotional condition.” State v. Hodges, 326 N.W.2d 345, 348 (Iowa 1982). In this case, Tyler’s depleted physical condition and despondent emotional condition carry significant weight. Several eases from other courts confirm that a highly vulnerable defendant’s statements are more likely to be involuntary, and I find them instructive here. See, e.g., Effland v. People, 240 P.3d 868, 878 (Colo.2010) (en banc) (concluding statements were involuntary when the defendant was suffering from extreme depression and had recently attempted suicide, and the “officers were fully aware of [his] mental condition and the failed suicide attempt at the time of the interrogation”); People v. Humphrey, 132 P.3d 352, 362-63 (Colo.2006) (affirming a trial court’s determination that a detective’s interrogation was coercive “given [the defendants weak and vulnerable state”); State v. Marshall, 642 N.W.2d 48, 55-56 (Minn.Ct.App. 2002) (finding statements involuntary in part because the defendant “became so emotionally upset that she cried ... and had difficulty breathing” and officers expressed concern about a need for medical assistance but did not cease questioning); Xu v. State, 100 S.W.3d 408, 414-15 (Tex.App.2002) (suppressing statements made after a defendant accused of killing his wife had been at the police station for hours, “was intermittently crying and clutching [his wife]’s picture,” and became “so distraught[] it took almost twenty minutes to calm him down”).
V. The Hospital Interrogation.
Tyler’s confession at the hospital did not cure the infirmity of the earlier police station confession and, in my view, should also be suppressed. The same officers conducted the serial interrogations less than twenty-four hours apart. The substance of the hospital interrogation reveals the officers’ purpose was to have Tyler again repeat the inculpatory statements she made before she received the Miranda warnings. Both officers repeatedly referenced the previous day’s conversations, asking Tyler if she remembered their names, if she remembered receiving Mi *184 randa warnings the day before, and even expressly referencing Tyler’s previous statements with phrases such as “At some point I think you said.... ” Early in Iowa’s history, this court concluded an invalid first confession rendered a second confession invalid even though ten months separated them. State v. Chambers, 39 Iowa 179, 183 (1874) (“[B]elieving the first confession admissible, the strong probability is that [the defendant] concluded a repetition could make the case no worse, and the last confession was made under the influence of the preceding one.”). We reversed the defendant’s conviction despite that long temporal divide between the interrogation sessions. See id. I would apply the same principle here where the sessions were separated by less than twenty-four hours.
VI. Conclusion.
The interrogating officer in Seibert candidly admitted a strategy to “question first, then give the warnings.” Seibert, 542 U.S. at 606, 124 S.Ct. at 2606, 159 L.Ed.2d at 651 (plurality opinion). Although the interrogating officers in this case did not expressly acknowledge an identical strategy, their failure to do so cannot be dispositive.[19] See id. at 616 n. 6, 124 S.Ct. at 2612 n. 6, 159 L.Ed.2d at 657 n. 6 (recognizing that officers’ subjective intent to delay Miranda warnings until after inculpatory statements are made will “rarely be ... candidly admitted” and recommending a “focus ... on facts apart from intent that show the question-first tactic at work”). If express acknowledgement of such a strategy were dispositive, Seibert would provide an implausibly narrow fact-specific rule and officers could avoid the mandate of Miranda without consequence as long as they did not admit their strategy. Rather, I agree with the Supreme Court’s observation that it is “unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because Miranda warnings formally punctuate them in the middle.” Id. at 614, 124 S.Ct. at 2611, 159 L.Ed.2d at 656.
The same should be said in this case for obvious reasons. If police can cure Miranda violations by simply taking a break in the interrogation and giving the required warnings after securing a confession, law enforcement officers will always be powerfully encouraged to question first and warn later. As the plurality opinion explained in Seibert, that kind of strategy actively avoids fulfilling Miranda’s prophylactic objective:
Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on the suspect’s part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that “anything you say can and will be used against you,” without expressly excepting the statement just given, could *185 lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.
Id. at 613, 124 S.Ct. at 2611, 159 L.Ed.2d at 655-56 (footnote omitted). This quotation from Seibert succinctly explains why the question-first-warn-later approach utilized by the officers in interrogating Tyler does violence to the Miranda rule and should not be condoned here.
I respectfully dissent in part because I conclude Tyler was in custody at all times after she was taken from her residence. Her motion to suppress should have been granted because all of her statements to the officers in the car, at the police station, and at the hospital were the product of a violation of the Miranda rule and because they were involuntarily made.
WIGGINS and APPEL, JJ., join this concurrence in part and dissent in part.

. The transcript of the police station interview in the record fills sixty-eight pages. Miranda warnings precede only the final six pages, which span the final sixteen minutes of the three-hour interrogation. During that time, Tyler overwhelmingly provided one-word answers, likely because the officers asked almost exclusively yes-or-no questions — for example, "You gave birth at approximately 12:00 p.m., okay?”; "[Y]ou said you filled up the bathtub with approximately two to three inches of water?”; and "[Y]ou brought the baby out of the tub and placed him in a trash can, correct?” In the few instances in which the officers did not ask a yes-or-no question, Tyler still answered very briefly. For example, to answer a question about where she gave birth, Tyler used just five words: "I was in the bathroom.”

. Tyler had previously revealed that Baby Tyler cried briefly after he was born. I find it significant that the officer did not stop posing questions and administer the Miranda warnings at that point. Instead, the officer forged ahead with the interrogation and did not stop until Tyler had admitted she had placed the baby face down in water in the bathtub. See Seibert, 542 U.S. at 616, 124 S.Ct. at 2612, 159 L.Ed.2d at 657 (“When the police were finished there was little, if anything, of incriminating potential left unsaid.'').

. Tyler’s repeated denials when asked at her residence and again at the police station whether she needed medical attention informs and confirms my overall assessment of how poorly she was functioning physically and emotionally during the interrogation.

. Notwithstanding the absence of such an explicit admission by the officers in this case, their strategy of questioning Tyler first and warning her later is unmistakable on this record. Just prior to transporting Tyler to the police station, the officers are overheard conferring among themselves about the word choices they would use in questioning Tyler about whether Baby Tyler was bom alive. They decided the interrogating officer driving Tyler to the station should not ask whether the baby was born alive, but whether it cried or moved.